### *In re* THOMAS *et al.*

*(Circuit Court, D. Colorado. June 6, 1888.)*

ATTORNEY AND CLIENT—MISCONDUCT OF ATTORNEY—DISBARMENT.

Upon a motion to disbar attorneys for malpractice, it was shown that they were notified that the deposition of a witness for whom they had sought would be taken by the adverse party. Being desirous of knowing what he would testify, they sent an agent to see him, with instructions to try to incline him as favorably towards their client as possible. Their agent induced the witness to keep out of the way, making him drunk for the purpose, and got him to come to the city where one of the attorneys was, and have a consultation with the latter at his office. There was no evidence that the attorneys directed the witness to be made drunk, or to be kept out of the way, nor that he should be bribed or intimidated. *Held* not sufficient misconduct for disbarment.

Motion to Disbar.

MILLER, Justice, (*orally.*) The case of the prosecution against Charles S. Thomas, a member of the bar, and James M. Downing, having been considered by Judge BREWER and Judge HALLETT, and they finding some difficulty in coming to a conclusion on the subject, the papers, with the testimony and printed arguments of counsel, were sent to me at Washington last winter, and I agreed to look into it; and the decision of the case has been practically left to me. It is not a very agreeable matter, and the record was a very long one. I did not have an opportunity to examine it until the end of the term at Washington. I propose to dispose of it this morning.

The charge made against these parties is a very serious one. Stripped of its verbiage, it is that Mr. Thomas and Mr. Downing, being employed as attorneys in a contest in one of the courts, undertook—to use a short and expressive phrase—to "tamper" with the witness of the other side.

The substance of the charge is that they, having received notice that the deposition of this witness, whose name is Oswalt, I believe, would be taken at Salt Lake City, sent an agent of theirs to find him out, and to get him away from Salt Lake City, so that the deposition would not be taken at all; and that they further brought him to this city, and that Mr. Thomas had private interviews with him, and that he was then spirited away, and registered at the hotel by a false name, so that even here he could not be found; and in various ways partaking of that character, that these attorneys undertook to thwart the ends of justice by contriving to get this witness out of the way, and also by offering him inducements to swear favorably to their client. If this charge were established by the evidence, I would have no hesitation in turning out the highest man that ever lived, if I had power to do it. The lawyer in this country is one of the administrators of justice. The judge who presides in the court is another, with more authority of position, and, perhaps, in some respects a more burdensome one. But the court, and the clerk, and the marshal, the sheriff, the jury, the lawyer, all constitute ministers of justice; and a lawyer who consciously undertakes to thwart justice is unfit for the position, as much as the judge who accepts a bribe, or knowingly decides a case against the law and the right; and it should be understood that they are subjected to the same responsibilities. They have a duty, undoubtedly, to their clients; but that is not the first duty, as is generally supposed. Their first duty is the administration of justice, and their duty to their client is subordinate to that. With regard to what has been proved in this case, I am happy to say that I do not think the case is made out in that full sense of an intention to do the great wrong which is charged against these parties that it should be proved, to justify an order to dismiss them from the bar. With regard to Mr. Downing, I shall say no more in these remarks, because he must stand or fall with Mr. Thomas. Mr. Thomas very manfully takes the whole of this matter upon himself. The instructions under which Mr. Eames, who did all this wrong, acted, were submitted by Mr. Downing to Mr. Thomas, as senior counsel in the case, who examined them, who approved of them, and who directed them to be delivered to Mr. Eames. It appears that this man Oswalt was familiar with the facts of the early inception of a mining claim which is in contest between Mr. Tobey and a Mr. Wheeler, and that it had been difficult to find out where he was. It may perhaps be said it sufficiently appears that both sides were anxious to get hold of him. Certainly it appears that Mr. Thomas, for his client, the defendant Wheeler, had been seeking for the whereabouts of this man for a good while, and his first intimation about where he probably was, was the receipt of the notification given by counsel on the other side that Mr. Oswalt's deposition would be taken on commission at Salt Lake City. Thereupon he and Mr. Downing instituted proceedings by which Mr. Eames, who is not a lawyer, as I understand it, but is some kind of an agent that does not shine very creditably in this connection, was requested to go to Salt Lake City and find Oswalt, and have a conversation with him, and, as is averred, get him away from there and

bring him here, where he could be interviewed by Mr. Thomas. It is very clear that Mr. Eames did go to Salt Lake, and found his man, had conversations with him, made him drunk, got him away so that the deposition could not be taken at the time appointed at Salt Lake, brought him to this place, took him to the office of Mr. Thomas, and Mr. Thomas had the conversation with him. Now, if it were clearly proved that Mr. Thomas gave directions and instructions to do all of this, I think his case would be a bad one. But Mr. Eames' instructions, so far as Mr. Thomas is concerned, are in writing, and what is not in writing depends mainly on the testimony of Mr. Thomas himself; and I must say, on behalf of Mr. Thomas, he swears with a great deal of apparent candor, with none of the usual effort to evade, and not to recollect, and get round things; and it is favorable to him, I think, that he states the case just as he understood it, and tells the truth. Mr. Thomas' view of some of these things may be unfortunate; and his explanation of why he did some of these things does not, in my opinion, come up to the highest standard of honor in the legal profession. He has views about those things which I would not approve. He has notions about the rights and duties of an attorney to look after his client's interests, and to seek interviews with his opponent's witnesses, and to bring them to his office, and things of that kind, which I do not think are justifiable. But we cannot expect every attorney of the court to be imbued with the very highest standard of legal ethics, and it would be a very dangerous rule that would throw every man over the bar whose views upon that subject were of a lower grade than those of gentlemen of a higher notion of the moral obligations of an attorney. It is somewhat like the general distinction between crimes punishable by statute and moral delinquencies, to which men must be left for their correction to the public sentiment of the community, or to religious principles, or to their general sense of right and wrong.

The main charge against Mr. Thomas, and the one which presses the hardest, is in these written instructions, which were prepared by Mr. Downing, were submitted to Mr. Thomas, considered by him very fully, and handed to Mr. Eames as the guide of his conduct. I do not think it necessary to read those particular sentences which bear the hardest upon Mr. Thomas, but they do imply a desire that this witness shall be seen by Mr. Eames before this deposition is given; they do imply a desire that Mr. Thomas shall in some way have an opportunity of talking with Mr. Oswalt; they do imply a desire that Mr. Eames shall, in his interview with Mr. Oswalt. if he obtains one, endeavor to make a favorable impression on Oswalt in regard to Mr. Thomas' client, (I think that is the worst expression in the instruction,) that he shall have a talk with him, and that he shall try to incline him favorably to Mr. Thomas' client. Certainly that cannot be approved of. Certainly it is a thing that ought not to be done. Certainly the practice of the law would become a very bad thing if the lawyer opposed to a man shall go to his witness and seek to impress him favorably to their side, or against him for whom he is known or expected to be a witness. I disapprove of such a thing as that

very much. I feel bound to say here that I do. But that is not the question that I am to decide. I am to decide whether Mr. Thomas was guilty of such moral delinquency and intention of wrong as disqualifies him for practicing law in this court. I cannot say it. I think Mr. Thomas acted very unwisely, very imprudently; did not act well in the matter. I should hate to see other attorneys here follow that example. But Mr. Thomas says, and swears, (and there comes in the value of the frankness with which he does swear; he does not deny all that; he takes it upon himself)—he says:

"I approved of these instructions, but I never thought for a moment of any improper inducements being held out to Mr. Oswalt to make him swear otherwise than what he would have sworn. It was no part of my advice that he should be tampered with by being made drunk, carried off to a hotel, or kept out of the way. I had no purpose of that kind; and the language does not necessarily imply it. I simply knew he was a very important witness for both sides, and that he had been hiding out of the way for months and months, and we wanted him as badly as the other side. I wanted an opportunity to know from his own mouth what he would swear to."

That is the substance of what Mr. Thomas says, and I am inclined to think he tells the truth. I do not think he meant bribery, or intimidation, or any guilty means of achieving the object which he had in view. The trouble is that that kind of a thing is susceptible of misconstruction; not only misconstruction, it is susceptible of abuse, and it is one of the means which lead to abuse.

Now, under the English system of law by which counsel and attorneys practice in the courts of that country, and from which we derive most of our law upon the subject, the attorney and the counselor or barrister have separate and distinct duties. All this which Mr. Thomas undertook to do through Mr. Eames belongs in that country to the attorney at law, or the solicitor in chancery,—the man who never appears in court at all, who gets up the testimony, who learns what witnesses will swear, or at least what the witnesses on his side will swear to, who endeavors to inform the barrister or counselor what will be proved on the other side,—and he, having ascertained all this, puts that into a paper called a "brief." That is the origin of the word "brief" in the practice of the law. This attorney, if it is a case at law, hunts all this up, ascertains, has his talk with his witnesses, learns from their own mouths what things they will testify to, and puts it down on paper, hands it to the barrister; and these are called "instructions" in the English practice. In those early days the lawyer made his speech before the evidence was offered. He says, "I am instructed that such and such things will be proven," and he refers to his paper, and he relies upon that instruction of the attorney; but he never has an interview with the witness, and it is considered unprofessional for him to have any talk in advance with a witness, even on his own side. But in this country that system has not prevailed. There is no separation of the duties of an attorney and a counselor. There is none in practice, although often those admitted to the bar are sworn in as attorneys and counselors both, but they perform the functions of both; and so the lawyer, placed as

Mr. Thomas was, is very often compelled for himself to have interviews with his own witnesses, and to ascertain what they will testify to in the matter; and in the same way he must seek, either from his client or somebody else, to know what will be the case against him.

Now, in this double capacity, Mr. Thomas was seeking for light, and pursuing, as he supposed, the best interests of his client, as he swears; and I think did believe consistently with the proper course for a lawyer exercising both the function of an attorney and counselor. I think he was mistaken in the propriety of some of the efforts he made to discharge that duty. I should be sorry to have them prevail as the common modes of practice in this country. But, having read all the testimony in this case, and read the deposition and sworn answer of Mr. Thomas, I cannot feel that he was morally guilty of such intentional misconduct as justifies his expulsion from the bar. The motion to that effect is accordingly overruled, and also with regard to Mr. Downing.